UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80809-CIV-COHN/SELTZER

AR2, LLC, a Florida limited liability company
d/b/a LIV INSTITUTE,

       Plaintiff,

vs.

ANDREW RUDNICK, an individual,

       Defendant.
_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Preliminary Injunction [DE 8] ("Motion"). The Court has carefully considered the Motion, Defendant's Response [DE 24] ("Response"), Plaintiff's Corrected Reply [DE 31] ("Reply"), the evidence and argument of counsel presented at the hearing on July 21 and 28, 2014, the record in the case, and is otherwise advised in the premises.

### I. BACKGROUND

On June 18, 2014, Plaintiff AR2, LLC d/b/a Liv Institute ("Plaintiff" or "Liv Institute") filed suit against Defendant Andrew Rudnick ("Defendant") alleging claims for violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA") and the Florida Uniform Trade Secrets Act, Fla. Stat. § 688, breach of contract, and breach of fiduciary duty. In the Complaint, Plaintiff alleges that Andrew M. Ress, M.D., a plastic surgeon located in Boca Raton, hired Defendant in August 2013,

to enhance Ress' brand and name recognition.  Compl. [DE 1] at 2 ¶¶ 1-2.[1]  The Liv Institute brand was created to market Ress' plastic surgery practice.  Id. at 2 ¶ 3.  In January 2014, Defendant was named Liv Institute's chief executive officer and co-manager for which he was to receive a salary of $120,000.  Id. at 2-3 ¶ 4.  Ress remained Liv Institute's Chief Medical Officer and co-manager.  Id. at 3 ¶ 5.  Additionally, Ress' approval was required for all "major decisions."  Id.  In connection with its business, Liv Institute utilized the service marks Liv, Liv Institute, and 844LivSexy (collectively the "Liv marks").  Id. ¶ 7.  Part of Defendant's job responsibilities included creating and registering domain names using variations of the Liv marks.  Id. ¶ 9.  Liv Institute also submitted an application to the U.S. Patent and Trademark Office to register the Liv Institute mark.  Id. ¶ 11.  Rather than register the domains for these marks in the name of the Plaintiff, however, Defendant registered the domains in his own name.  Id. ¶¶ 12-13.  When Ress discovered that the Liv domains were registered in Defendant's name, he demanded that they be immediately transferred to Liv Institute.  Id. ¶ 14.  Defendant refused.  Id. ¶ 15.

Ress also discovered that while Defendant was serving as CEO, he engaged in misconduct, including misappropriation of Liv Institute's funds, transfer of funds from Liv Institute to his own business, failing to withhold taxes from his paycheck, and theft of Liv Institute's intellectual property and trade secrets.  Id. at 3 ¶ 6.  As a result of this misconduct, Defendant was fired as CEO for cause.  Id. ¶ 17.  Defendant has refused

---

[1] Plaintiff restarts his general allegations at paragraph 1 rather than continuing the numbering from the beginning of the Complaint.  Thus, the Complaint contains two paragraphs one through six.

all demands to turn over the Liv domains.  Id. ¶¶ 18-21.  Defendant has also interfered with Plaintiff's business by shutting down Liv Institute's website and commandeering Plaintiff's social media platforms including its Facebook, Google plus, and Twitter accounts.  Id. ¶¶ 21-22.  Plaintiff also contends that Defendant caused defamatory reviews to be placed on yelp.com and has redirected Plaintiff's business to a pornographic website.  Id. ¶¶ 23, 25.  Finally, Plaintiff alleges that Defendant has retained and failed to destroy or return Plaintiff's confidential information and trade secrets such as its client/patient information and vendor list and has been soliciting its employees, consultants, and vendors in violation of the non-solicitation provision of the operating agreement.  Id. ¶¶ 28, 30.  Plaintiff brings claims for violation of the ACPA (Counts 1-3), breach of the non-solicitation provision of the Operating Agreement (Count 4), breach of the Operating Agreement's confidentiality-trade secret provisions (Count 5), violation of Florida's Uniform Trade Secrets Act, Fla. Stat. § 688 (Count 6), and breach of fiduciary duty (Count 7).

On June 20, 2014, Plaintiff filed the instant Motion which seeks issuance of a preliminary injunction requiring that Defendant immediately transfer control of the domain names www.LivInstitute.com and www.844LivSexy.com to Plaintiff because Defendant's registration of these domains in his own name violated the ACPA.  Defendant opposes the Motion.  Defendant first argues that Plaintiff was not even entitled to file this lawsuit because, under the terms of the Operating Agreement, Rudnick and the Rudnick Trust did not vote in favor of terminating him or filing suit against him.  Response [DE 24] at 3.  Defendant also asserts that he always understood that he owned the domain names at issue in the Motion.  Id. at 4.  He also

3

contends that he created and registered the "Liv Institute" domain before Plaintiff began marketing or providing services under this name. Id. at 5. Moreover, "Liv" is not distinctive (Plaintiff has utilized the mark for less than six months) and has not acquired any secondary meaning in the plastic surgery field. Id. Finally, Defendant contends that Plaintiff's ACPA claims fail because Plaintiff cannot establish that he had a bad faith intent to profit from the marks. Id. at 6. Instead, Defendant contends that he always owned the domain names and intended to license them to Plaintiff. Id. Defendant also disputes that he ever attempted to ransom the domain names for $18,000. Id. at 6-7. Rather, Defendant maintains that Plaintiff wrongfully withheld approximately 5 weeks pay from him and wrongfully disputed $27,000 in company related expenses with American Express. Id. at 7.

## II. DISCUSSION

### A. Legal Standard.

To obtain a preliminary injunction, a plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the defendant is not enjoined; (3) the threatened injury to the plaintiff outweighs the harm an injunction may cause defendant; and (4) the injunction would not disserve the public interest. See Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998) (internal citations and quotations omitted)).

The ACPA "provides a cause of action for a trademark owner against a person who 'has a bad faith intent to profit from [the owner's] mark' and who 'registers, traffics in, or uses a domain name' that is identical or confusingly similar to the owner's distinctive mark or that is identical, confusingly similar to or dilutive of the owner's famous mark." Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1323 (11th Cir. 2011) (quoting S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1243 (11th Cir. 2009) (footnote omitted)). To prevail on an ACPA claim, a plaintiff must prove that "(1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit." Bavaro Palace, S.A. v. Vacation Tours, Inc., 203 F. A'ppx 252, 256 (11th Cir. 2006) (citing Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001)).

### B Whether Plaintiff Had a Right to Commence this Lawsuit.

Defendant first argues that Plaintiff has failed to demonstrate a likelihood of success on the merits because Plaintiff had no right to file this lawsuit. Response at 3. In support of this argument, Defendant incorporates the arguments made in his separately filed Motion to Dismiss, Alternatively Motion for Summary Judgment [DE 20] ("Motion to Dismiss"). In the Motion to Dismiss, Defendant argues that Plaintiff lacked authority to initiate this lawsuit because pursuant to Florida statute,[2] the members of a limited liability company must vote and a majority vote is required before a lawsuit can

---

[2] The statute in question, Fla. Stat. § 605.04073, provides that in a member-managed limited liability company, "the affirmative vote or consent of a majority-in-interest of the members is required to undertake an act outside the ordinary course of the company's activities and affairs." Fla. Stat. § 605.04073(1)(d).

be filed.  Motion to Dismiss at 2.  In this case, both the Ress and Rudnick trusts hold a 50% membership interest in Plaintiff.  Id.  Because the Rudnick Trust never voted in favor of or consented to the filing of this lawsuit, Defendant contends that the lawsuit is an *ultra vires* act.

Defendant's argument that the filing of this lawsuit was *ultra vires* is premised on his belief that a limited liability company's operating agreement cannot supersede Florida's limited liability company statute.  Defendant is wrong.  Under Florida law, "[t]he governance and operation of an LLC in the absence of other written terms is a simple matter of majority rule." Kertesz v. Spa Floral, LLC, 994 So. 2d 473, 475 (Fla. Dist. Ct. App. 2008).  The statute, therefore, only provides default rules which the parties may alter via agreement.  See id. at 475 n.1 ("Neither the complaint nor the amended complaint referred to-much less attached a copy of-any articles of organization or operating agreement relating to the LLC, or any contract between the LLC and Kertesz. As a result, the analysis of Kertesz's claims is governed by section 608.4231(3), Florida Statutes (2007), and applicable decisional law."); Louis T. M. Conti & Gregory M. Marks, Florida's New Revised LLC Act, Part II,  87 Fla. B.J. 47, 47 (2013) ("[T]he features of the revised act discussed below are 'default' provisions, all of which can be overridden or supplemented by the terms of the operating agreement of the LLC, with the exception of the nonwaivable items described in F.S. §605.0105.").

Fla. Stat. § 605.0105 provides that an operating agreement may govern: "(a) [r]elations among the members as members and between the members and the limited liability company; (b) [t]he rights and duties under this chapter of a person in the capacity of manager; (c) [t]he activities and affairs of the company and the conduct of

those activities and affairs." Fla. Stat. § 605.0105(1).  How decisions are made in manager-managed limited liability companies is not listed among the non-waivable provisions.  Fla. Stat. § 605.0105(3)-(4).  Thus, Defendant's argument that the statute governs fails.

Moreover, here, the Operating Agreement provides that the ability to bring suit is a major decision that must not be made "unless and until such . . . have been discussed between the Managers, and same has been approved by Ress."  Operating Agreement [DE 1-6] ¶ 5.01.  During the evidentiary hearing, Ress testified that he informed Defendant that if he did not comply with certain demands made of him and memorialized in a June 7, 2014 letter that he would be sued.  Ress also testified that he authorized the filing of this lawsuit.  Thus, because the record before the Court establishes that the filing of the instant lawsuit complied with the terms of the Operating Agreement, it was not an *ultra vires* act and cannot serve as a basis to deny the Motion.

### C. Whether Plaintiff Has Met the Standard for Preliminary Injunctive Relief.

#### 1. Whether Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits.

##### a. Whether the Liv Marks are Distinctive or Famous.

To prevail on its ACPA claims, Plaintiff must first establish that its marks are distinctive or famous.  See Bavaro Palace, S.A., 203 F. A'ppx at 256.  Registration of a trademark establishes a rebuttable presumption that it is distinctive.  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007) (citing 15 U.S.C. § 1057(b)) ("Registration establishes a rebuttable presumption that the marks are protectable or 'distinctive.' ").  Here, Plaintiff represents that it has applied for registration of the mark

"LIV Institute." The testimony at the evidentiary hearing, however, was clear that this application has yet to be accepted by the Patent and Trademark Office. Thus, the mere fact that a trademark application has been filed does not bear on the Court's analysis of whether the mark is distinctive or famous, as required to establish a likelihood of success under the ACPA.

A "distinctive" mark is a mark that serves "the purpose of identifying the source of the goods or services." Forman, 509 F.3d at 1357 (citations omitted). Marks can be either "inherently distinctive," acquire distinctiveness by becoming associated in the minds of the public with the products or services offered by the proprietor of the mark, or never distinctive. Id. (citations omitted). Distinctiveness is a question of fact. Id. As explained by the Eleventh Circuit: "[t]rademark law distinguishes four gradations of distinctiveness of marks, in descending order of strength: fanciful or arbitrary, suggestive, descriptive, and generic." Id. An arbitrary or fanciful mark "bears no logical relationship to the product or service it is used to represent." Id. (citing Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980)). A suggestive mark "refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product." Id. at 1357-58. A descriptive mark "identifies a characteristic or quality of the service or product." Id. at 1358. A generic mark "suggest[s] the basic nature of the product or service." Tana v. Dantanna's, 611 F.3d 767, 774 (11th Cir. 2010).

A descriptive name, even if not inherently distinctive, can acquire distinctiveness or "secondary meaning" by becoming associated with the proprietor's product or service. Forman, 509 F.3d at 1358 (citing Am. Television & Comm'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1548-49 (11th Cir.1987)). A name has

acquired secondary meaning when "the primary significance of the term in the minds of the [consuming] public is not the product but the producer." Id. (quotations omitted).  A prima facie showing of "secondary meaning" can be demonstrated by demonstrating "that the name has been used in connection with the proprietor's goods or service continuously and substantially exclusively for five years." Id. (citing 15 U.S.C. § 1052(f)). Whether a name has attained secondary meaning depends on the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service.  Id. (citing Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984)).  Both parties agree that the Liv marks are not famous.  Motion at 12; Response at 5.  Given that Plaintiff has used the Liv marks for less than six months, the Court concludes that the marks have not yet achieved secondary meaning. Thus, for Plaintiff to prevail on its ACPA claims, the Liv marks must be inherently distinctive.

Plaintiff argues that "Liv Institute" is an arbitrary and fanciful mark which entitles it to the greatest protection.  Motion at 13.  Defendant, on the other hand, argues that the Liv Institute mark is not distinctive.  Response at 5.  The Court disagrees with Plaintiff's assertion that "Liv Institute" is an arbitrary and fanciful mark.  The trademark application for Liv Institute reflects that Plaintiff registered "Liv Institute" in connection with "Cosmetic and plastic surgery; Medical clinic providing medical aesthetic procedures, including, laser hair removal, laser peels, botulinum toxin treatments, microdermabrasion, liposuction, vein treatments, vein therapy, cellulite treatments, body

9

contouring treatments, injectable filler treatments, facials, and skin care; Counseling in the field of mental health and wellness; Wellness and health-related consulting services; Health spa services for health and wellness of the body and spirit." Liv Institute Trademark Application, Plaintiff's Exhibit 48.  Instead, the Court finds that "Liv Institute" is a suggestive mark because"Liv" refers to a characteristic of a plastic surgery, health and wellness business.  Yet, a "leap of the imagination" is necessary to connect "Liv Institute" with plastic surgery, cosmetic, and wellness services.  See Forman, 509 F.3d at 1357-58.  "Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable." St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1208 (11th Cir. 2009) (quoting Coach House Rest., Inc. v. Coach & Six Rests., Inc., 934 F.2d 1551, 1560 (11th Cir. 1991)).  Thus, Plaintiff has established that the "Liv Institute" mark is distinctive.

   Plaintiff also argues that its "844 LIV-SEXY" mark is arbitrary and fanciful. Motion at 13.  Alternatively, Plaintiff argues that this mark is suggestive.  Id.  As with the "Liv Institute" mark, the Court finds that "844 LIV-SEXY" is suggestive of some element of a plastic surgery, health and wellness business, but additional effort is required to connect this mark with this type of business.  See Sanderson, 573 F.3d at 1208 (holding that a jury reasonably could have concluded that LaserSpecialst.com mark was suggestive because "it does not immediately convey the nature of the services offered and requires a leap of the imagination to deduce that a 'laser specialist' is a oculoplastic surgeon.").  Accordingly, Plaintiff has also established that the "844 LIV-SEXY" mark is distinctive.

b. Whether the Domain Names are Identical or Confusingly Similar to Plaintiff's Marks.

The second element Plaintiff must establish–that the Defendant's domain name is identical or confusingly similar to the Plaintiff's mark–does not require discussion. It is undisputed that the domains at issue contain Plaintiff's marks and were once by Plaintiff. Thus, this element has been satisfied.

c. Whether the Defendant Registered or Used the Domain Names with a Bad Faith Intent to Profit.

Finally, to demonstrate a likelihood of success on the merits on its ACPA claims, Plaintiff must establish that the Defendant registered or used the domain names with a bad faith intent to profit. Nine factors a court may consider in making this determination include:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information

> when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).  The statute also provides a "safe harbor" which provides that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

Here, Defendant contends that Plaintiff cannot establish the requisite bad faith because he registered the domain names prior to the formation of the company. Response at 6.  Defendant further contends that he believed the domain names were always his intellectual property and that he was licensing them to Plaintiff.  Id.  Finally, Defendant denies that he demanded $18,000 from the Plaintiff to return the domain names.  Id.

At the evidentiary hearing, Defendant maintained that the Liv marks were his intellectual property, developed and registered as domain names during his non-working hours.  Regardless of the circumstances under which the Liv marks were created,[3] it is apparent that these domain names were always intended to be Plaintiff's

---

[3] A rebuttal witness called by Plaintiff, Adriana Molinari DiAngelo testified that at a company Christmas party, she was the one who suggested Liv as a possible name for the business.

property, not Defendant's.  Indeed, Defendant was made a manager and CEO of Liv Institute to develop Ress' brand, marketing, and business.  Furthermore, the Operating Agreement provides that Defendant could only pursue outside business ventures if they were "not in competition with the business of the Company."  Operating Agreement ¶ 5.02(a).  In exchange for his services as CEO, Defendant was to receive a salary of $120,000 per year.  Id. ¶ 5.02(b).  On January 31, 2014, while serving as CEO, Defendant approved registration of the fictitious name Liv Institute.  See Plaintiff's Exhibit 50.  Defendant later approved registration of Liv Institute LLC to protect ownership of the name.  See Plaintiff's Exhibit 55.  Thus, Defendant's claim that his development of the Liv marks and registration of the Liv domains was separate and apart from his responsibilities as Plaintiff's CEO simply defies credibility.[4]

Although the Court finds that Plaintiff likely owns the domain names at issue, in order to prevail upon its ACPA claims, Plaintiff also must establish that Defendant had a bad faith intent to profit from the domains. The record does not support this conclusion. To the contrary, it appears that the domains at issue only became inaccessible after someone hacked into Defendant's Omnis account and moved the domains to a new account.  After Defendant recovered the domains back into his Omnis account, it appears that he learned that he would be sued and was advised by counsel not to

---

[4] The fact that Defendant registered the Liv domains to his own Omnis account rather than a separate account for Plaintiff has no bearing on the Court's determination that the Liv domains were never Defendant's intellectual property.  The record establishes that Defendant registered all domain names being considered for Plaintiff's business to his own Omnis account and that during his tenure as CEO, an Omnis account was never created for Plaintiff. Compare Plaintiff's Exhibit 59 (email from Andrew Rudnick to Andrew Ress and Aaron Feldman subject "this is what we have so far" with Defendant's Exhibit 11 (email from Andrew Rudnick to counsel subject "my domains that I own-I have been acquiring domains for over 10 years).

transfer the domains.  Moreover, while there is ample evidence that Defendant demanded payment before he would turn over control of the domain names to Plaintiff, it appears that Defendant believed that he was owed money.  See, e.g., Defendant's Exhibit 12 ("Please pay me what u owe, we can transfer the domains, and we can all move on with our lives."); Plaintiff's Exhibit 101 ("I am not holding anything 'hostage'- just do the right thing, pay me what you owe me, so we both can get focused on our own businesses and nothing else ... You want the domains?? Pay me-"); Plaintiff's Exhibit 68 ("Not a problem Wes[.] Waiting for Ress to pay me or At [ ] least place what he owes me in my attorney's escrow account until deal is finalized.").  Thus, the record does not reflect that Defendant was seeking a profit.  See Coca-Cola Co. v. Purdy, 382 F.3d 774, 786 (8th Cir. 2004) (defining profit as "an attempt to procure an 'advantageous gain or return'").[5]

Other than demanding what he believes he is owed in exchange for turning over the domains, there is no other evidence before the Court that Defendant has profited from the domains.  For example, there is no evidence that Defendant has employed the

---

[5] The Court recognizes that the Ninth Circuit has held that holding a domain as leverage in a business dispute can indicate a bad faith intent to profit under the ACPA.  See DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1221 (9th Cir. 2010) (holding that registration or use of domain name in order to obtain leverage in business dispute could be sufficient to establish bad faith).  The facts of Nahum, however, are unique.  In that case, the defendant took down his former company's website after he went to work for a competitor.  624 F.3d at 1217.  He then placed a notice on the website indicating that plaintiff's customers should direct all fashion inquiries to him at his email address.  Id.  By contrast here, there is no evidence that Defendant has gone to work for a competitor or is otherwise diverting customers through the Liv domains.  As of today's date, both the livinstitute.com and 844livsexy.com domains bring web browsers to an omnis landing page.  Unlike Nahum, Plaintiff has failed to present clear evidence of lost business associated with the removal of the Liv domains.  Thus, under the unique facts of this case, Plaintiff has failed to establish that Defendant's retention of the Liv domains indicates his bad faith intent to profit.

domains to divert business or customers from Plaintiff.  See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 509 F. Supp. 2d 1337, 1350 (N.D. Ga. 2007) (declining to grant summary judgment on ACPA claims in case involving business dispute between the parties where there was evidence defendant used transfer of domain names as leverage to receive what he believed he was owed, but no evidence that defendant intended to divert customers).  At bottom, this case is a business dispute between partners which has morphed into an acrimonious divorce.  Notwithstanding any other claims Plaintiff might assert against Defendant related to his retention of the domain names, this case does not involve the type of cybersquatting that the ACPA was intended to redress.  Thus, issuance of a preliminary injunction is not an appropriate remedy.

2. Whether Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction.

Even if Plaintiff had established a likelihood of success on the merits on its ACPA claims, to be entitled to injunctive relief, Plaintiff also must establish that it faces an irreparable injury.  The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).  Here, Plaintiff has failed to demonstrate irreparable harm.  Although it is currently unable to access the Liv Institute website, this mark and website has been in use for less than six months.  Moreover, Plaintiff has subsequently created a website for Ress' plastic surgery business, livplasticsurgery.com.  Given that Liv Institute was created to market Ress' plastic surgery business and a website for the plastic surgery business is still operational, Plaintiff has failed to demonstrate irreparable harm. Without a finding of a likelihood of an "actual and imminent" irreparable injury,

preliminary injunctive relief is improper.  See Siegel, 234 F.3d at 1176 ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").  Accordingly, this factor does not support issuance of a preliminary injunction.

### 3. Whether the Balance of the Equities Weighs in Favor of a Preliminary Injunction & Whether an Injunction Would Serve the Public Interest.

Finally, neither of the remaining factors support issuance of a preliminary injunction.  As discussed above, this case is an intercompany dispute.  Plaintiff has failed to demonstrate a likelihood of success on the merits or that it will be irreparably harmed. Thus, the balance of the equities weighs against issuance of a preliminary injunction.  Moreover, given the internal nature of this dispute, the public interest would not be served by the issuance of a preliminary injunction.  Because the domain names at issue are currently offline, there is no danger of the public being misled while the parties resolve their dispute on the merits.

### III. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction [DE 8] is **DENIED**;

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, on this 7th day of August, 2014.

_____
JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF.